STATE OF VERMONT

ENVIRONMENTAL COURT

Secretary, Vermont Agency of     }     Docket No. 164-7-02 Vtec
Natural Resources, Plaintiff,     }
    }
    }
v     }
    }
    }
Dennis Marshall, Respondent.     }

Decision and Order

On June 25, 2002, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an administrative order pursuant to 10 V.S.A. § 8008 regarding Respondent, who timely requested a hearing in Environmental Court. Respondent is represented by Eric G. Parker, Esq.; and the Secretary of the Agency of Natural Resources is represented by Gary S. Kessler, Esq.

The Court extended the time for the hearing for good cause at the request of and by agreement of the parties, to accommodate the schedules of the parties and to allow discovery. The Court also extended the time for the issuance of the decision for good cause. No environmental harm resulted from the delay, as no remedial order is at issue in this case.

The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. § 1259(a); 10 V.S.A. Chapter 201; and § § 6.3 and 8 of the Vermont Wetland Rules. 10 V.S.A. § 8012(c)(2).

Findings

This case involves damage to a Class II wetland that occurred in the summer of 2000 on a 16.7-acre parcel of property (" the property" ) owned by Peter G. Hack on Crossett Hill Road in Duxbury, Vermont. As of the spring and summer of 2000, the property contained wetlands, including a series of beaver dams and beaver ponds, which constituted a mapped Class II wetland and had the appearance to a non-expert of a swamp or wetland. The wetland included both scrub-shrub and emergent wetland, with a dynamic system of at least five stacked beaver ponds. The wetland drained into Crossett Brook through a small unnamed tributary linking the beaver ponds. The wetland in its original state provided the functions and values of floodwater storage and stormwater runoff control, surface and groundwater protection, wildlife and migratory bird habitat, open space, aesthetics, and erosion control. Crossett Hill Brook in its original state was a high quality small high gradient stream and qualified as a Class B stream under the state Water Quality Standards.

Respondent is a contractor and home builder, with substantial experience doing excavation work in Vermont. Until the early 1990s he ran an excavation company. His uncle, Ray Marshall, has thirty years experience in excavation work and also worked in the family excavation company. Generally, when working on projects with a registered professional engineer, Respondent takes

direction about where to excavate from the project engineer. As of the late spring of 2000, Respondent was aware generally of the existence of the Vermont Wetlands Rules and program, and the fact that excavation and other site work in wetlands could not proceed unless the work had a prior permit (Conditional Use Determination) from the State Wetlands program. It is customary for either the landowner, a project engineer, or the contractor to apply for and obtain a Conditional Use Determination for work in or near a wetland. Respondent as an experienced excavator is familiar with erosion controls applied during excavation work.

Peter Hack is a registered professional engineer who maintains his registered professional engineer licensure and has designed a half dozen septic systems, including one for Respondent's house. However, he does not work primarily as an engineer but works as a project manager for a construction company. He has also purchased property on his own account for development, although not on a regular basis. He has purchased property for development in Duxbury and in Moretown, including the property at issue in this case.

In the late spring of 2000, Respondent had a personal relationship with Valerie Zimmerman, a real estate agent in the Duxbury area. Valerie Zimmerman brokered the sale to Peter Hack of the property at issue in the present case. Prior to the purchase, in May 2000, Mr. Hack had percolation tests done on the property to determine if there was an area on it suitable for septic disposal. Mr. Hack knew Respondent through work and around town and intended that he work on the project. He hired Respondent on an hourly basis to operate the backhoe necessary during the percolation tests. The result of the percolation tests revealed an upland area on the property away from the wetlands, suitable for septic systems for single-family houses.

Mr. Hack purchased the property for $45,000, of which he borrowed approximately $20,000 from Ms. Zimmerman, who took back a promissory note but not a mortgage. Respondent originally intended to develop the property for eight lots, but ultimately only received permits for the development of five lots on the property. As of at least May of 2000, Mr. Hack, Respondent and Ms. Zimmerman intended generally that Mr. Hack would do the engineering work, Respondent would do the site work and be available to lot purchasers for house construction services, and Ms. Zimmerman would market the lots, but they entered into no formal arrangement towards that end. In the summer of 2000, Respondent showed at least one potential buyer the property, representing himself as an owner of the property or at least as one capable of arranging the sale of the property or the sale of a lot to be subdivided from the property.

On June 21, 2000 Respondent telephoned the regional office for the State Wetlands program to obtain a wetlands map for the property. Respondent visited the office later that day to purchase it. The staff informed him that from the map there appeared to be a Class II wetland at the property and that he or the owner should discuss the property with the district wetlands coordinator before doing any work in the wetland. Respondent testified that he brought the map back to Mr. Hack, who told him to remove the beaver ponds and ' not to worry' about the wetlands. Mr. Hack denied giving Respondent those instructions; however, we find Respondent's testimony to be more credible than Mr. Hack's on this point, even though Mr. Hack had settled with the Agency and was not subject to further prosecution for the violations, for the reason that in the proceedings against him, Mr. Hack accepted his own responsibility for the violations, and expended more than $30,000 in remedial work and $8,500 in penalties or their equivalent,

without in those proceedings claiming that Respondent had done the work without Mr. Hack's knowledge or contrary to his instructions.

From August 7 through August 10, 2000, Respondent worked on the property by himself in the evenings, clearing brush.

On August 11, 2000, Respondent and his uncle, Ray Marshall, worked on the property. In the morning, Ray Marshall delivered to the property a tracked excavator which respondent had rented. During the work, Ray Marshall operated the excavator and Respondent directed the work. The work Respondent directed to be done included the breaching or removal ("ripping out") of the beaver dams, the ditching of streams and other site work to channelize and drain the wetland area. At least two of the ponds were removed entirely, a channel was dug through the former pond sites and the channel of the stream formerly linking the beaver ponds was dug out, with the excavated material piled alongside the new channel. This work constituted filling, grading and dredging in a Class II wetland. Respondent took no steps to install or use erosion controls, or otherwise to prevent discharge to the brook, while doing the work.

Neither Respondent nor Mr. Hack had applied for or obtained a Conditional Use Determination for the work from the State Wetlands office. Neither Respondent nor Mr. Hack had applied for or obtained a Discharge permit to discharge silt or any other substance into Crossett Hill Brook. At least five residential lots could have been developed on the property as a whole without any disturbance of the wetlands.

By late morning on August 11, 2000, Crossett Hill Brook was running brown with silt downstream of and discharged from the Hack property, but was clear above that area.

On August 13, 2000, Respondent allowed a so-called 'mud bogging' party to take place within the drained wetland and within the floor of one of the former ponds, during which two to four all-terrain vehicles drove over and through the drained wetland area for a period of two to three hours, doing additional damage to the wetland and releasing additional sediment to be washed downstream. Respondent was present at the party, although did not drive any of the vehicles; Ms. Zimmerman participated in the party and did drive one of the vehicles. Respondent invited a neighbor to participate in the party. We conclude that Respondent had some control of whether the party occurred.

Mr. Hack was not personally present on the property on August 11, 2000 or on August 13, 2000. He was in Vermont but working at another location in state. The District Wetlands Biologist attended a site visit on August 14, 2000 and on August 15, 2000 issued a Notice of Alleged Violation to Mr. Hack as the landowner, requiring him to cease all work on the site and to have a wetland delineation performed. Mr. Hack did not deny responsibility for the work done or its resulting damage, and did not claim at that time that Respondent did the work or the resulting damage against Mr. Hack's instructions.

As of site visits performed by the District Wetlands Biologist and an aquatic biologist in early September 2000, Crossett Hill Brook had been dredged and channelized for a length of about 300 feet, with piles of dredged material (highly erosive soft sediment) left in the wetlands with

no erosion controls. The highly erosive soft sediment in the bottom of the drained beaver ponds had been left exposed and drained, with the pond bottoms that were used for mud bogging left in an extremely disturbed, churned-up state, subject to extreme erosion during any rainfall events. The functions and values of the wetland were seriously disrupted and will take some years to be fully restored even after the completion of the remedial work.

The entire length of Crossett Hill Brook below the disturbed area at issue in this case was seriously damaged by the discharge of silt and other sediment into the brook. A layer of very fine silt had been deposited which had built up to as much as three to six inches deep on the gravel substrate or bottom of the stream. This type of siltation can drive a fish community right out of the disturbed area. The silt filled in the interstitial spaces among the gravel and rocks which is the habitat for aquatic invertebrates or insects, resulting in a severe decrease in the numbers or abundance of aquatic insects, to the point that the formerly Class B stream failed one of the criteria (density or abundance of aquatic insects) for classification as a Class B stream. In addition, several pond or wetlands species, in particular the giant water bug and the red spotted newt, were observed in the stream, having probably been transported there with the flow of water when the beaver dams were breached. Because the sediment transported into Crossett Hill Brook was extremely fine, it would continue to cause degradation of the stream for months, if not years, until the work area was stabilized and the silt had been flushed from the stream.

After receiving the Notice of Alleged Violation on August 15, 2000, Mr. Hack cooperated with the directives of the Agency and had consultants develop a stabilization plan, which included the installation of silt fences and hay bales to prevent further immediate erosion, and to stabilize the soil, seed and replant over the longer term. Mr. Hack submitted a draft stabilization plan on October 19, 2000, of which the short-term plan was approved and the long-term mitigation proposal was not approved. Mr. Hack began the short-term stabilization effort, although it was not completed or inspected by the Wetlands Section before the onset of winter. The long-term stabilization plan was approved in the summer of 2001, implemented in October of 2001, and completed as of November 20, 2001.

Mr. Hack hired Respondent on an hourly basis to do some of the remedial work required by the State, under direction of the consultant Mr. Hack had hired to design and supervise the remediation plan. The Court finds it unlikely that Mr. Hack would have hired Respondent to do this work if Mr. Hack had thought Respondent had caused the harm to begin with by disregarding Mr. Hack's intentions or instructions. Rather, it is more credible that Respondent was carrying out Mr. Hack's intentions or instructions, both in doing the initial work that caused the environmental harm and in doing the remedial work. However, we must specifically note that this fact does not relieve Respondent of responsibility for the violations as well, as discussed below.

As of the spring of 2002, Mr. Hack had expended more than $30,000 on the consultants' fees and remedial work on the property. Respondent has filed a lien against the property for approximately $25,000 worth of work he did for Mr. Hack on this and another property, of which approximately $6,000 was for his work done on the property.

In the spring of 2002, Mr. Hack entered into a settlement with the Agency regarding these violations, under which he had to pay $8,500 as a penalty, part of which was allocated to funding a supplemental environmental project, above the $30,000 he had already expended on remedial work on the property.

Conclusions as to Violation (10 V.S.A. § 8012(c)(1)):

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. § 8012(b)(1), independently of reviewing and determining anew a penalty amount. 10 V.S.A. § 8012(b)(4).

By grading, draining, dredging and filling in a Class II Wetland without a Conditional Use Determination for the work, Respondent violated Vermont Wetlands Rule § 6.3.

By discharging silt to state waters without a permit, Respondent violated 10 V.S.A. § 1259(a).

Determination of Order and Penalty (10 V.S.A. § 8012(c)(3)):

The Administrative Order against Respondent contains no remedial provisions. 10 V.S.A. § 8012(b)(2). Therefore, the Court must only review and determine anew an appropriate penalty amount for the violations by applying the eight criteria set forth in 10 V.S.A. § 8010(b). 10 V.S.A. § 8012(b)(4). In the Administrative Order the Secretary imposed a penalty of $25,000 for both violations. In this proceeding the Secretary has requested a penalty of $21,000 for the wetlands violation plus an additional $12,500 for the discharge permit violation, for a total of $43,500 now requested by the Secretary.

First we must note that for a civil penalty to withstand constitutional scrutiny, it must be basically remedial in effect, rather than punitive. The methodology inherent in the statute and applied by this Court is to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. § 8001(2) and § 8010(b)(5), and then to apply the remaining statutory factors to determine what additional penalty is needed, or whether mitigating factors should reduce any element of the penalty. That is, the entire economic benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

Respondent argues that due to the relationship between Respondent and the landowner, Peter Hack, and the fact that Mr. Hack was a registered professional engineer, Respondent bears no responsibility for his actions. However, for an experienced excavation contractor, or other experienced agent, employee or independent contractor in the field, the excuse of ' just following the landowner' s orders' is not an automatic excuse but rather at best may be mitigating factor, subject to the Court' s examination of whether it was reasonable for the particular contractor to have done so under the particular circumstances of a given case. Under the circumstances of the present case, even if Mr. Hack was primarily responsible and did direct Respondent to remove the beaver ponds and ' not to worry' about the wetlands, Respondent as an experienced excavation contractor who knew enough to obtain the wetlands map from the State Wetlands

office should have known better than to carry out Mr. Hack's instructions without first either satisfying himself that Mr. Hack had checked with and obtained any necessary approvals from the State Wetlands office, or checking with the State Wetlands office himself.

We take each of the penalty factors in turn. The economic benefit to Respondent for the violations was only the $6,000 he was or is supposed to be paid for doing the work at the site. The work did not in fact allow the subdivision of the property into any more than the five

lots it would have supported before the violations, and therefore even if Respondent does obtain the business of building houses on the resulting lots, he will not obtain any additional economic benefit resulting from the violations.

Substantial actual environmental harm resulted to Crossett Hill Brook and its aquatic biota from both violations. Unfortunately, such harm is difficult to assess economically, and no evidence was presented on that point to assist the Court in linking the serious environmental damage with the proposed penalty amount. Respondent bears a greater level of responsibility for the harm resulting from the discharge violation than for that resulting from the wetlands violation, and will have to bear a portion of the remedial costs for the discharge violation. That is, the level of harm that would have resulted from the removal of the beaver dams and dredging of the channel in the wetlands, for which Mr. Hack bears primary responsibility and Respondent bears accessory responsibility, was increased by the damage caused by the mud bogging party, for which Respondent bears a greater level of responsibility. The Court will assess a substantial component of the penalty to acknowledge, if not to completely account for, the harm done to Crossett Hill Brook. § 8010(b)(1).

The mitigating circumstance of Mr. Hack's being an engineer and that he could have directed Respondent to check with the State Wetlands office before doing the work, or could have directed the use of particular erosion control techniques, is more than balanced by the fact that Respondent was an experienced excavation contractor who knew that the presence or absence of wetlands was important before beginning excavation in an evident wetland, that it should be established by consultation with the State Wetlands office in the field, that appropriate erosion control measures should be taken, and knew or should have known that the mud bogging party would cause additional damage to the wetlands and discharge to the stream. We will also consider as a minor mitigating circumstance that the Secretary did not issue the administrative order against Respondent until two years after the events and after the order had been resolved against Mr. Hack and the remedial measures had been taken. § § 8010(b)(2) and (3).

Respondent has no prior record of non-compliance. § 8010(b)(4). The Secretary does not seek actual costs of enforcement in the present case. § 8010(b)(7). The length of the violations was relatively short, considered as when the work was done and the mud bogging party occurred, but it was not until several months later that the remedial work was begun, and it was not completed until the following spring. However, the timing of the remedial work was not within Respondent's control, therefore we will consider the duration of the violation to be relatively brief as to him. § 8010(b)(8).

With regard to considerations of deterrence, we must treat the wetlands violation and the discharge violation somewhat differently. The Secretary requests the assessment of half the total remedial costs against Respondent. However, it is appropriate for the landowner to bear the greater burden of the remedial work, as he will receive all the profits from the sale of any of this land for development purposes. Respondent' s lost expenditure of effort and money doing the excavation and remedial work, including renting the machine and paying for Ray Marshall' s time as operator, combined with the cost of the present litigation, has a sufficient deterrent effect so that a substantial penalty not including the remedial costs, above the removal of the economic benefit, is sufficient to achieve deterrence for the wetlands violation. On the other hand, unlike the wetlands violation, an additional penalty component is necessary to achieve deterrence of future discharge violations. That is, Respondent should pay a component of the remedial costs for the discharge violation, in recognition of the fact that the mud bogging party caused additional damage and additional discharge. § 8010(b)(6).

Accordingly, taking all these factors into account, the Court will impose a penalty for both violations of a total of $18,250, calculated as $6,000 in removal of economic benefit, plus a penalty equivalent to Mr. Hack' s settlement penalty of $8,500 (half allocated to the wetlands violation and half to the discharge violation), plus an additional penalty for the discharge violation in the amount of one-eighth of the remedial work or an additional $3,750. Based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED that:

Paragraph A of the June 25, 2002 Administrative Order is vacated. On or before August 1, 2003, Respondent shall pay a penalty of $18,250 for the violations to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. § 8010(e). If the parties wish to agree to a payment schedule, including any issues related to Respondent' s collection of any unpaid amounts from Mr. Hack, they should discuss it with each other and may submit an agreed schedule as a joint motion to amend this order.

Rights of Appeal (10 V.S.A. § 8012(c)(4) and (5)):

WARNING: this decision will become final if no appeal is requested within 10 days of receipt of this decision. Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to the exceptions in Vermont Rules of Civil Procedure (V.R.C.P.) 76(a)(3) and (d)(5). Within 10 days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.C.P. 62 and V.R.A.P. 8.

Done at Barre, Vermont, this 9th day of June, 2003.

_____
Merideth Wright
Environmental Judge